## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____

NABIL AL-KHAROUF                          )
43749 Mccollough Court                    )
Ashburn, Virginia 20147,                  )
                                          )          Civ. Action No.:
    And                )
                                          )          JURY TRIAL DEMANDED
KADIH NAHED                               )
2103 Preston Square Court                 )
Falls Church, Virginia 22043,             )
                                          )
    And                )
                                          )
DEREK L. PRICE                            )
1936 W. Fayette Street                    )
Baltimore, Maryland 21223,                )
                                          )
    And                )
                                          )
ALENA SVOZIL                              )
9309 Harrisons Farm Way                   )
Gaithersburg, Maryland 20882,             )
                                          )
    Plaintiffs,        )
                                          )
    v.                 )
                                          )
DISTRICT OF COLUMBIA                      )
1350 Pennsylvania Avenue, NW              )
Washington, D.C.  20004,                  )
                                          )
    Defendant.         )
                                          )
Serve:  Mayor Muriel Browser              )
    1350 Pennsylvania Ave., N.W.   )
    Suite 316          )
    Washington, D.C.  20004   )
                                          )
    Office of the Attorney General   )
    441 4th Street, N.W., Suite 600 S   )
    Washington, D.C.  20001   )
_____)

## COMPLAINT

Plaintiffs Nabil Al-Kharouf, Kadih Nahed, Derek L. Price and Alena Svozil ("Plaintiffs"), by and through counsel, complain of Defendant as follows:

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331; 42 U.S.C. Section 2000e-5(f), et seq., and 42 U.S.C. Section 1981(a).

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of a state and a foreign corporation.

3. This Court has personal jurisdiction over Defendant because it engages in continuous and systematic business contacts within the District of Columbia.  Additionally, Plaintiffs' claims arise, in part, out of activities in the District of Columbia.

4. Venue is proper in the District of Columbia pursuant to 28 U.S.C. Section 1391 and 42 U.S.C. Section 2000e-5(f)(3) because Defendant resides in this District, conducts business in this District and engaged in discriminatory conduct in this District. Assignment in this District is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter's claims occurred in the District of Columbia.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. Plaintiffs have exhausted their administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission.  All Plaintiffs received their Notice of Right to Sue on or about November 27, 2017.  This Complaint has been timely filed within the 90-day timeframe.

### THE PARTIES

6. Plaintiff Nabil Al-Kharouf resides at 43749 Mccollough Court, Ashburn, Virginia 20147.

7. Plaintiff Kadih Nahed resides at 2103 Preston Square Ct, Falls Church, Virginia 22043.

8. Plaintiff Derek L. Price resides at 1936 W. Fayette Street, Baltimore, Maryland 21223.

9. Plaintiff Alena Svozil resides at 9309 Harrisons Farm Way, Gaithersburg, Maryland 20882.

10. On information and belief, Defendant is a municipality organized under the laws of the United States and has its offices at 1350 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

## FACTS

11. Defendant, through its Department of Employment Services ("DOES") has engaged in the intentional pattern and practice of employment discrimination against individuals who are not of Indian descent/national origin, including discrimination in its hiring and termination decisions.

12. Information Technology Staff Augmentation ("ITSA") is the Defendant's method for the procurement of information technology staff augmentation contractors.

13. Defendant's Office of Chief Technology Officer ("OCTO") awarded the ITSA contract to OST, Inc. (Optimal Solutions and Technologies) in August 2008.  OST, Inc. facilitates the staff augmentation procurement process between District program managers and ITSA-registered vendors.

14. On information and belief, OST, Inc. is an Indian owned corporation.

15. OST, Inc. employed Plaintiffs (non-Indian descent) and assigned them to work on its contract with Defendant.

16. In April/May 2015, DOES appointed Mr. Tharmalingam Annamalai as its Associate Director.  Mr. Annamalai is of Indian-Tamil descent/national origin.

17. Mr. Annamalai immediately started targeting non-Indian-Tamil individuals (U.S. Citizens) and corporations for termination and replacement by H1-B Indian Non-Citizen ITSA contractors.  Mr. Annamalai did not target any Indian Non-Citizen ITSA Contractors.

18. Mr. Annamalai stated to DOES Manager Mr. Frinso Padavil that he wanted to replace Nabil Kharouf (Arab-American), Nahed Kadih (Arab-American), Derek Price (African-American) and Alena Svozil (Czech-American) with H1-B Indian Non-Citizen ITSA Contractors.

19. Mr. Padavil subsequently was terminated to eliminate opposition to the H1-B Indian Non-Citizen ITSA contractor replacement practice.

20. Since April/May 2015, only individuals of Indian descent/national origin have been hired by Mr. Annamalai as DOES ITSA contractor, and only non-Indians have been terminated as a DOES ITSA contractor.

21. In furtherance of the discriminatory processes, Defendant has hired, as DOES ITSA contractors, only Indian visa workers, including individuals with H1-B visas.

22. H1-B visas are intended to be used to bring specialized foreign workers to the United States when there are insufficient United States workers to perform the jobs at issue.

23. Mr. Annamalai and his H1-B Indian Non-Citizen DOES ITSA contractors demanded that the H1-B Indian Non-Citizen DOES ITSA contractors be mentored and trained.

24. Mr. Annamalai and the DOES ITSA H1-B Indian Non-Citizen Contractors speak in Tamil/Hindi at DOES, preventing non-Indian individuals from understanding and participating in DOES related discussions.

25. Mr. Annamalai is verbally abusive to non-Indian DOES ITSA contractors.  He shouts, intimidates and creates an unprofessional and hostile work environment.  Since the hiring of Mr. Annamalai in April/May 2015, there is a culture of hostility towards, and non-acceptance of, American (and non-Indian) workers.

26. The result of the Defendant's discriminatory practice is DOES ITSA workforce that now consists entirely of Indian contractors.  The H1-B Indian Non-Citizen DOES ITSA

contractors have replaced Nabil Kharouf, Nahed Kadih, Derek Price and Alena Svozil do not have commensurate skill and expertise.

27. Defendant's discrimination is intentional and done with malice and reckless indifference to the protected rights of non-Indian ITSA contractors.

28. ITSA/OST is an active participant and fully aware of the targeting actions of Mr. Annamalai.

29. Upon information and belief, Mr. Annamalai recently was reprimanded for staff abuses and procurement irregularities by the District of Columbia government.

30. Upon information and belief, ITSA/OST and the District of Columbia Government allow H1-B employees to remain at Defendant agencies for extended periods of time without securing authorization and approval from the United States Government.

*Plaintiff Nabil Kharouf's Experiences*

31. Plaintiff Kharouf is the President of Noble American IT Corp ("Noble").  Plaintiff Kharouf holds MS & BS degrees in Computer Science, MS in Technology Management and Federal CIO certification from the University of Maryland and George Washington University.

32. Noble is an ITSA-registered vendor and federal certified small business.  Noble subcontracts with AVID Systems ("AVID") on the DOES IT contract (from July 2012 – Present).

33. The Noble-AVID contract automatically renewed itself in July on an annual basis.  It automatically renewed itself in July 2015 for the period July 2015 – June 2016.

34. Noble's performance at DOES since July 2012 has been excellent.  Noble is a Microsoft Certified Partner and VMWare Partner.

35. Mr. Annamalai targeted the Noble-AVID contract for termination by purporting to advertise a rate of $129/hour, above the ITSA/OST rate cap of $108/hour.  A pre-

selection candidate had already been made by Mr. Annamalai.  ITSA/OST was actively involved and fully aware of the targeting actions of Mr. Annamalai towards Noble and Plaintiff Kharouf.

36. A company identified as Prime Source Technologies, LLC ("Prime Source") placed an ad in the Washington Post dated August 13, 2015 for our contract with an expiration date of September 9, 2015.

37. Mr. Annamalai previously worked with ITSA/OST and Prime Source to place 2 H1-B Indian Non-Citizen contractors at DOES.

38. Mr. Annamalai was Prime Source's Project Manager in 2010.

39. After Mr. Annamalai's actions with Prime Source were discovered, Mr. Annamalai funneled the pre-selected Indian Non-Citizen candidates through another Indian-owned vendor, BluePrint Consulting Services LLC.

40. H1-B Indian Non-Citizen ITSA contractors filtering, reviewing & interviewing IT candidates for positions posted by ITSA/OST in violation of ITSA rules.  The H1-B Non-Citizen ITSA contractors have been identified as Jayanth Kuman, Satish Godse and Saraavan Swaminathan.

41. Mr. Annamalai demanded that Plaintiff Kharouf mentor and train the H1-B Indian Non-Citizen ITSA contractors.  Plaintiff Kharouf refused in accordance and compliance with federal and state regulations that mandate a clear separation of duties/contracts.

42. Mr. Annamalai demanded that Plaintiff Kharouf put him and other H1-B Indian Non-Citizen ITSA contractors on all Noble email correspondence.  Plaintiff Kharouf refused to put them on all its email correspondence in accordance and compliance with federal and state regulations that mandate a clear separation of duties/contracts and in compliance with privacy laws.

43. Mr. Annamalai demanded that DOES Third-Party IT contractors/vendors not communicate with Noble and Plaintiff Kharouf on DOES work related issues.

44. On September 15, 2015, Plaintiff Kharouf was asked to leave DOES.  Mr. Annamalai also announced on the same day the hiring of pre-selected Indian Non-Citizen (Ankur Patel) as a replacement for Plaintiff Kharouf.

45. Plaintiff Kharouf contacted ITSA/OST and AVID and was informed the AVID contract was still active and not terminated.

46. Plaintiff Kharouf was then notified by ITSA and AVID that he had resigned per feedback from Mr. Annamalai.

47. Plaintiff Kharouf did not resign, and refuted this misrepresentation by Mr. Annamalai.

48. Plaintiff Kharouf was notified approximately 48 hours later by ITSA/OST that the Noble-AVID contract was terminated by Mr. Annamalai.

49. Noble and Plaintiff Kharouf were replaced by an H1-B Indian Non-Citizen ITSA Contractor who was selected several weeks earlier by Mr. Annamalai and his H1-B Indian Non-Citizen ITSA contractors.

### *Plaintiff Nahed Kadih's Experiences*

50. Plaintiff Kadih is the President and Senior IT Consultant at NAZS Software Solutions, Inc. ("NASZ").

51. NASZ subcontracts with LC Systems on the DOES IT contract (August 2012 – Present). This subcontract automatically renews in August on an annual basis, it automatically renewed itself in August 2015 for the period of August 2015-August 2016.

52. DOES Indian-Tamil Associate Director Mr. Annamalai promoted Jayanth Kumar from a software programmer to be the team technical lead.  Mr. Kumar is a mechanical engineer degree holder.  He was one of the programmers who always needed assistance from

Plaintiff Kadih as Mr. Kumar did not have an expertise in the software architecture fundamentals.

53. Mr. Kuman is an Indian-Tamil who always spoke the Tamil language with Mr. Annamalai in the work place.

54. Mr. Annamalai and Mr. Kumar started interviewing candidates for different roles within the agency.  Plaintiff Kadih asked Mr. Annamalai if he wanted a recommendation for candidates.  Plaintiff Kadih forwarded Mr. Annamalai a resume of Tawfiq, a US Citizen with 15 years of experience in project management.  Mr. Annamalai claimed he contacted Mr. Tawfiq five times and left voice messages and that Mr. Tawfiq did not respond back.  However, Mr. Tawfiq informed Plaintiff Kadih that no calls or voice messages were received from Mr. Annamalai.

55. Plaintiff Kadih requested that Mr. Annamalai and Mr. Kumar let himself and other consultants be involved in the interview process for the Senior Software positions being recruited for, and he received no response.

56. Mr. Annamalai started meeting daily with Mr. Kumar and other south-Indian co-workers, excluding Plaintiff Kadih.  Rather, Plaintiff Kadih was only invited to the meeting if it concerned the training of someone recently hired.

57. Within two months, Mr. Annamalai hired more Indian workers, none US citizens.  First Saravanana Swaminathan joined DOES through Prime Source Technologies, LLC, which Mr. Annamalai formerly managed.  Mr. Kumar was the only person who interviewed him.

58. Mr. Annamalai instructed Plaintiff Kadih to train Saravanan Swaminathan on existing projects that he had been working for the last three years.

59. Plaintiff Kadih informed Mr. Kumar about Mr. Swaminathan's average skills and his unreliability.  Mr. Kumar asked Plaintiff Kadih not to interfere and complaint about Mr.

Swaminathan's skills.  A day later, Mr. Annamalai informed Plaintiff Kadih that he did not care about his performance and could find any reason to fire him.

60. Shortly thereafter, Mr. Swaminathan was hired as a senior software.net developer.

61. Beginning in June, co-workers (such as Mr. Annamalai, Mr. Kumar, Mr. Swaminathan and Sunny Pandit) regularly spoke Hindi-tamale language in front of Plaintiff Kadih, excluding him from work conversations and removed positive statements about his work from emails before forwarding amongst each other.

62. One of the major projects Plaintiff Kadih worked on for DOES was the LexisNexis project.  The project was under Plaintiff Kadih's duties since 2013 and he had developed cutting edge API to interface with LexisNexis service.  In August, Mr. Annamalai asked me to transfer the LexisNexis project to Mr. Swaminathan.

63. On September 10, 2015, Mr. Annamalai asked Plaintiff Kadih to meet.  At the meeting, Plaintiff Kadih was asked to join the Summer Youth project and follow Mr. Kumar's instructions.  Upon joining the team, Plaintiff Kadih informed Mr. Kumar that the code which was written by Mr. Pandit needed fixes and the quality of work was problematic for any future maintenance.  Mr. Kumar immediately went to Mr. Annamalai.

64. On September 11, 2015, Mr. Annamalai asked Plaintiff Kadih to leave work immediately without any explanation.  Plaintiff Kadih followed his instructions.

### Plaintiff Derek Price's experiences

65. On January 10, 2011, Plaintiff Price contracted as a Business Analyst for the Department of Employment Services, Office of Information Technology through a subcontract with Sigman and Summerfield.  Plaintiff Price reported to the Chief Information Officer, Michael Price and the Unemployment Insurance ("UI") Director Mary Tucker.

66. Despite numerous changes in DOES Directors, UI Directors and Chief Information Officers, Plaintiff Price's contract was annually renewed five consecutive years with the

final renewal through the end of fiscal year September 30, 2015.  Throughout the years of

his contract, the level and scope of responsibilities increased, and Plaintiff Price

ultimately reported to the then-Director of DOES, Thomas Luparello.

67. Several months after Mr. Luparello left his position as the DOES Director, Plaintiff

Price's reporting manager was changed to Mr. Annamalai, Associate Director of the

Office of Information Technology.  Plaintiff Price's responsibilities remained the same

for approximately one month, then the scope and level of his responsibilities started to

decrease.

68. On June 28, 2015, Mr. Annamalai verbally attacked Plaintiff Price.  Mr. Annamalai

improperly accused Plaintiff Price of subpar performance, questioned the quantity of the

work Plaintiff Price performed throughout the duration of his contract and threated him

with termination.

69. On June 30, 2015, Plaintiff Price emailed Kyrisha Deschamps, the Customer Support

Manager for the Information Technology Staff Augmentation ("ITSA") contract for the

D.C. Office of the Chief Technology Officer ("OCTO") inquiring about the process for

lodging a formal complaint against a manager who verbally abused and threatened a

contractor.

70. On July 2, 2015, in an attempt to diffuse the situation, Plaintiff Price requested a meeting

with Mr. Annamalai to discuss his expectations.  During that meeting, Plaintiff Price was

informed that his contract would be terminated effective July 17, 2015.  However, the

next day, July 2, 2015, Plaintiff Price was unable to access DOES email or servers.  No

reason was provided.

71. After Plaintiff Price was terminated, he learned he was replaced with Satish Godse.

### *Plaintiff Alena Svozil's experiences*

72. Plaintiff Svozil worked for Defendant between January 2011 and July 2015.

73. Plaintiff was hired as a consultant, business process improvement specialist and a project manager for projects intended to prepare the agency for a technology and process modernization.

74. During the summer of 2011, Plaintiff Svozil was assigned a task by former Director Luparello to implement and process support for SUTA Dumping (fraud detection for employers' tax manipulation).  Plaintiff Svozil completed her task and began training staff to use the SW.  Plaintiff continued in this position until August 2014.  During that time, Plaintiff Svozil generated leads of potential fraud in total value of more than $3.3 million dollars.

75. In February 2014, Plaintiff Svozil was assigned to be a project/program manager and consultant for the first phase of the Unemployment Insurance Modernization – an implementation of the Employer Self-service Portal.  According to the assessment of Director Luparello, Plaintiff Svozil was uniquely fit for the position not only by expertise in business process improvements, a qualification of a senior project manager, and by familiarity with processes of Unemployment Insurance.  Plaintiff accepted this assignment, declining a job offer for a full-time position of a project manager extended to her by the federal government.

76. As a program manager, Plaintiff Svozil directly participated on planning of the modernization effort.  Implementation phases of the individual program components were planned between January 1, 2015 and September 2017.

77. After Mr. Annamalai started, Plaintiff Svozil was transferred.  Mr. Annamalai immediately created a highly hostile work environment.  He used unsubstantiated information to attack Plaintiff Svozil's results while he was not providing any instructions or guidance concerning his expectations.  Plaintiff Svozil attempted to continue the successful completion of her tasks, and had no complaints regarding her

performance.  Rather, her advice was sought by the Agency's Chief Operating Officer, and she worked directly with the Agency's Program Manager and the Acting Director Carroll on their tasks.

78. On July 16, 2015, Mr. Annamalai requested to meet with Plaintiff Svozil.  During that meeting, he informed Plaintiff Svozil that he had decided to terminate her contract. When Plaintiff Svozil inquired why, Mr. Annamalai responded that he didn't need to tell her a reason.  After a short exchange, Plaintiff Svozil was permitted to close her time sheet and was escorted out of the building.

79. Plaintiff Svozil was replaced by an H1-B Indian Non-Citizen ITSA Contractor, Mr. Satish Godse, who was pre-selected several weeks earlier by Mr. Annamalai and his H1-B Indian Non-Citizen ITSA contractors.  Later Mr. Annamalai also hired Ms. Anuradha Uppala, another H1-B Indian Non-Citizen ITSA Contractor, to work in the role for which Plaintiff Svozil was previously contracted.

80. Defendant is liable to Plaintiffs as their joint employer.

81. Defendant possessed and exercised the authority to hire and fire Plaintiffs and Defendant was responsible for the day-to-day supervision of Plaintiffs.

82. Plaintiffs' work was performed on Defendant's work site with Defendant's equipment.

83. Defendant's unlawful conduct was willful, malicious, wanton, and reckless.

84. Plaintiffs have sustained damages as a result of Defendant's unlawful conduct consisting of lost wages, lost benefits, front pay, front benefits, emotional distress, pain and suffering, and mental anguish.

## COUNT 1

85. Plaintiffs repeat and reallege paragraphs 1-84 as if fully set forth herein.

86. By and through its conduct, Defendant has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race and Indian national

origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in employment decisions, including hiring, placement, promotion/demotion, and termination decisions; (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin in employment decision, including hiring, placement, promotion/demotion, and termination decision; (c) knowingly and intentionally creating and maintain an overwhelmingly disproportionate contracting workforce within the Department of Employment Services (primarily H1B visa holders from India).

87. As a direct result of DC's intentional discrimination, Plaintiffs have been terminated.

88. Defendant's actions constitute unlawful discrimination on the basis of national origin in violation of 42 U.S.C. Section 2000e, et seq.

## COUNT 2

89. Plaintiffs repeat and reallege paragraphs 1-88 as if fully set forth herein.

90. By and through its conduct, Defendant has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race and Indian national origin by: (a) knowingly and intentionally favoring individuals of South Asian race and Indian national origin in employment decisions, including hiring, placement, promotion/demotion, and termination decisions; (b) knowingly and intentionally disfavoring individuals who are not of South Asian race and Indian national origin in employment decision, including hiring, placement, promotion/demotion, and termination decision; (c) knowingly and intentionally creating and maintain an overwhelmingly disproportionate contracting workforce within the Department of Employment Services (primarily H1B visa holders from India).

91. As a direct result of DC's intentional discrimination, Plaintiffs have been terminated.

92. Defendant's actions constitute unlawful discrimination on the basis of national origin in violation of 42 U.S.C. Section 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, et seq.;

b. A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. Section 1981;

c. A permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all person acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

d. Order Defendant to adopt a valid, non-discriminatory method for hiring, placement, termination and other employment decisions;

e. Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race or national origin;

f. Award Plaintiffs compensatory damages for the harm they suffered as a result of Defendant's violations of Title VII and Section 1981 in the amount of no less than $1,200,000.00;

g. Award Plaintiffs pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII and Section 1981;

h. Award Plaintiffs front- and back-pay, and such other equitable relief as the Court deems just and appropriate;

i. Award Plaintiffs punitive damages;

j.  Award reasonable attorneys' fees, expert witness fees, expenses and costs of this

action and prior administrative actions; and

k.  Award Plaintiffs such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs respectfully demand a trial by

jury on all issues properly triable by a jury in this action.

Dated: February 26, 2018                    Respectfully submitted,

                                       _/s/_____
                                       Alan Lescht, DC Bar # 441691
                                       Rani Rolston, DC Bar # 974052
                                       Alan Lescht & Assoc., P.C.
                                       1825 K Street, N.W, Suite 750
                                       Washington, D.C. 20006
                                       Tel (202) 463-6036
                                       Fax (202) 463-6067
                                       Alan.Lescht@leschtlaw.com
                                       Rani.Rolston@leschtlaw.com
                                       Attorneys for Plaintiff